LUM AH LEE, LUM YUEN SING, LUM AH SAM, LUM YET, LUM KUM, LUM LOY, TONG KIT, WAI SUNG, MAN LUM, and LUM SING, doing business as copartners under the firm name of SEE YICK WAI COMPANY *v.* AH SOONG, TING SING, WONG GONG and FONG YUEK.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED JANUARY 8, 1901.     DECIDED APRIL 26, 1901.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

In a suit in equity brought to restrain respondents from interfering with water rights alleged to be appurtenant to certain land of the

complainants, held, that the burden is upon the complainants to establish by a preponderance of the evidence the rights claimed by them and that in this case such burden has not been successfully borne and that the evidence is too conflicting, uncertain and unsatisfactory to permit or justify a finding on the point in favor of the complainants.

From time immemorial a dam, known as the Paaluhi dam, has been maintained at a certain point across the Manoa stream, with a certain opening in said dam, however, as more particularly described in the opinion, the object of such opening being to permit all of the water in the stream, except so much as is diverted under the circumstances by the ditch leading off from said dam, to flow on to irrigate other lands. Held, that the lands watered by the ditch just mentioned have no right, in times of drought, to close said opening or otherwise to divert through such ditch all of the water in the stream at that point, and that in such times the conditions at the dam and ditch must be permitted to remain the same as in times of plenty and that all must suffer accordingly.

Counsel fees paid to obtain the dissolution of a temporary injunction in an equity suit are recoverable as a part of the damages provided against in the condition of a bond filed to secure the granting of such injunction.

A court of equity in the original suit may, in its discretion, as against the complainants and principals in such bond, either assess and award the amount of such damages, or leave the parties to an action at law to recover the same.

### OPINION OF THE COURT BY PERRY, J.

These are proceedings in equity, wherein it is prayed that the respondents be enjoined from interfering with certain water rights alleged to be appurtenant to certain lands of the complainants situate in Manoa Valley, Oahu.

The complainants hold under lease about twenty-three acres of taro land on the Ewa side of the main Manoa stream and about two acres of taro land on the Waikiki side of said stream. The respondents hold under like tenure four or five acres of land

on the Ewa side of the stream and five or six acres on the Wai-
kiki side thereof, all or nearly all of such land being taro land,
and all being situate mauka of the complainants' lands.

From time immemorial two certain dams have been main-
tained across the Manoa Stream. The one further mauka is
called for the purposes of this case the Paaluhi dam and the
other the Bishop dam, the office of the latter being to divert
water to irrigate lands on the Ewa side of the main stream and
of the former to divert water to irrigate lands on the Waikiki
side. It is agreed by the parties herein that the lands of the
complainants on the Ewa side of the stream are entitled to the
water flowing in the ditch leading from the Bishop dam, this
ditch being hereinafter called Ditch A, every night from 6
P. M. to 6 A. M. and further on Mondays, Fridays and Saturdays
from 12 o'clock noon to 6 P. M.; and, subject only to the claim
hereinafter stated, it is undisputed in this case that the respond-
ents' lands on the Waikiki side of the stream are entitled at all
times to the water flowing in the ditch leading from the Paaluhi
dam, hereinafter called Ditch B.

The complainants claim that their taro land on the Waikiki
side known as the Elemakule land, is entitled to water indirectly
from Ditch B, to wit, from the respondents' patches known as
the Napua land watered thereby and adjoining the Elemakule
land on the mauka side, and that the respondents cannot law-
fully divert the water from Ditch B back into the main stream
or otherwise before the Elemakule land has been supplied.
Respondents, on the other hand, absolutely deny that the Elema-
kule land is entitled to any water from the Napua land or from
Ditch B, and say that the ancient water right of the Elemakule
land was from certain premises across the East Manoa road
known as the Bill Bray land.

The other main point in controversy in the case is this: the
respondents claim that the right of the Napua and other lands
watered by Ditch B is to take from the stream at the Paaluhi
dam all the water which such lands may require for irrigation
purposes irrespective of whether or not much or little or any
water is left to flow past such dam after such diversion; while the

claim of the complainants is that firmly imbedded in the stream, in the line and a part of the Paaluhi dam, are two large and well known rocks and that it has been the custom from time immemorial, and is the right of the lands watered by Ditch A, to have the space between the two rocks kept open so that a portion only of the water flowing in the stream above the dam may be diverted to the east side and the remainder flow on down the stream until it reaches the Bishop dam and is diverted into Ditch A.   During the period of drought which immediately preceded and gave rise to the present litigation, the respondents, while apparently admitting the complainants' right to water at certain times from Ditch A, nevertheless at all times, except when their (the respondents') own lands were entitled to water from Ditch A, filled the gap between the stones just referred to and diverted practically *all* the water in the stream through Ditch B, thus effectually depriving the complainants of all water excepting only such,—an inconsiderable quantity—as reached the lower dam by seepage through the upper or through the banks of the stream.

First, as to the water right of the Elemakule land.   The burden is upon the complainants to establish by a preponderance of the evidence the right claimed by them.   To review at length and in detail the evidence adduced, seems to us to be unnecessary.   Our conclusion is that the complainants have not established by a preponderance of the evidence that the land in question has acquired by prescription or otherwise the right to water from Ditch B through or over the Napua land occupied by the respondents.   The evidence is too conflicting, uncertain and unsatisfactory to permit or justify a finding on this point in favor of the complainants.

As to the respective rights of the parties at the Paaluhi dam. We find from the evidence that from time immemorial the opening between the two stones in the Paaluhi dam, as above mentioned and as existing at the time this Court visited the locality last January, or an opening substantially like that just referred to, has been maintained by the parties interested in the water

rights at that point. Likewise we believe from the evidence that the Paaluhi ditch has been maintained from time immemorial substantially as it was at the time of said visit. Excepting only at very rare intervals, Manoa has always been a valley favored with a rainfall amply sufficient to meet the needs of its lands for purposes of irrigation, and the Paaluhi ditch, as also the main stream both above and below the Paaluhi dam, has had a supply of water sufficient for the lands irrigated thereby. There have been in times past occasions when the rainfall was not so plentiful and when as a consequence the supply of water in the stream was somewhat low. Credible evidence has been introduced which tends to show that whenever on such occasions attempts were made to close the opening in the Paaluhi dam and thus divert more than the accustomed proportion of water through the Paaluhi ditch, such attempts were met by forcible physical resistance on the part of lower landholders. It is undisputed, however, that by far the most serious drought which has ever occurred in Manoa was that of 1900 which immediately preceded and gave rise to this suit. The attempts then made by the respondents to close the opening in the Paaluhi dam and to divert all or nearly all the water in the stream through ditch B was promptly followed by the institution of these proceedings.

The fact would seem to be, then, that prior to 1900 the droughts were of short duration and not severe enough to compel or lead to a definite test and settlement as to what the rights of the parties are at the Paaluhi dam when the water in the stream is insufficient to supply all the lands dependent upon ditches B and A. While water has been plentiful, each has taken as much as he needed and allowed the remainder to flow on and no one has been injured by the acts of any of the others. Certainly there is no evidence from which we can find that the lands dependent on Ditch B have by adverse user acquired the right to take at any time all of the water in the stream at and immediately above the Paaluhi dam. On the contrary, we believe from the evidence that the respondents, representing those lands, have no right so to do or to alter substantially the original and accustomed conditions at the dam and ditch. In times of drought, the dam and ditch must remain in

the same condition substantially as in times of plenty, and all must suffer accordingly. And this accords with natural justice. See *Peck v. Bailey*, 8 Haw. 672, 673, where Chief Justice Allen said, with reference to three auwais which led off from the Wailuku stream on Maui, "Kalaniauwai, Kamaauwai and the mill water course are entitled to all the water which has flowed in them from time immemorial. And if at any time there is a drought, and the water is diminished in the Wailuku river, these auwais will lose *pro rata*. The proprietors of the Kalaniauwai have no right to divert the water of the river so that the Kamaauwai and the mill water course will not have their usual flow. \* \* \* The original purpose of these water courses was to supply kalo patches and the intention of the kono-hiki must have been to give all the kalo lands on this ahupuaa rights of water at all times when needed. Kalaniauwai has no priority of supply over Kamaauwai and the mill water course, because it was situated above them on the stream, and neither has Kamaauwai superior rights to the mill water course for the same reason; but all are entitled to their usual flow."

It is urged that the complainants' contention with reference to the rights at the Paaluhi dam cannot be sustained, because enforcement of a decree in their favor would not be practicable. It is true that no accurate measurement of the quantity or pro-portion of the water flowing in Ditch B or in the stream past the dam has ever been made, and it is evident that such quantity and proportions vary at different times according to the quantity in the stream above the dam; but we see no inherent impos-sibility in continuing to do that which for a great many years the native Hawaiians have done, to wit, maintain the dam and the ditch in substantially the same condition as they were in Jan-uary last and in the time prior thereto. It is better to maintain existing rights as far as possible and substantially than to know-ingly alter them materially or to destroy some of them entirely.

The respondents' bill of costs, amounting in all to $107.00 and allowed by the Circuit Judge, contains an item, "expenses dissolving injunction, $50.00." In support of this item an affidavit was filed showing as we construe it, that respondents had paid their counsel the sum of $50.00 as a retainer for their

services in the case generally, and not especially for obtaining a dissolution of the temporary injunction. The decree requires the complainants to pay all the costs taxed at $107.00. If this item was allowed, as seems to have been the case, as an "actual disbursement" or "attorneys' fees" under Section 1492 of the Civil Laws, then it was so allowed erroneously. See *Willard v. Vincent,* 13 Haw. 237. If, however, the order was intended as an assessment and award under the bond filed by complainants of damages suffered by the respondents in consequence of the issuance of the temporary injunction, the law applicable would be this: counsel fees paid to obtain a dissolution of the restraining order itself and irrespective of the main suit are damages directly and proximately resulting from the issuance of the injunction and are recoverable just as much as other costs, charges or damages to which the party might be put by reason of the restraining order. See *2 Sutherland, Damages,* p. 64 et seq.; *High on Injunctions,* 1685 et seq.; *16 Am. & Eng. Encycl. Law,* 2nd ed., 467, 468.

On the question of whether or not such damages may be assessed and awarded in equity, the authorities are not uniform, but we believe the better rule to be that they may so far as the complainants and principals on the bond are concerned, it being within the sound discretion of the court as to whether or not in each particular case it will itself dispose of the matter or leave the parties to an action at law. See *Russell v. Farley,* 105, U. S. 433, 445, 446; *Coosaw Min. Co. v. Farmers' Min. Co.* et al., 51 Fed. 107.

The decree appealed from is reversed and the case is remanded to the Circuit Judge of the First Judicial Circuit with instructions to ascertain the amount of damage suffered by the complainants in consequence of the respondents' wrongful acts and to enter a decree in accordance with his findings thereon and in conformity with the foregoing views.

*Peterson & Matthewman* and *W. O. Smith* for the complainants.

*Robertson & Wilder* for the respondents.